# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **PEOPLE FIRST OF TENNESSEE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | No. 3:95-cv-1227 |
| v. ) | Judge Sharp |
| ) | |
| **CLOVER BOTTOM** ) | |
| **DEVELOPMENTAL CENTER, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

This is a declaratory judgment action relating to the authority of the Quality Review Panel ("QRP") under the Settlement Agreement ("Agreement") entered into by People First of Tennessee, the United States of America (collectively "Plaintiffs"), and the State of Tennessee ("State Defendants") (Docket No. 327). Pending before the Court is Plaintiffs' Motion for Declaratory Relief (Docket No. 1046), through which Plaintiffs request a declaratory order affirming that the QRP has the authority, under the Agreement, to conduct on-site visits at Green Valley Developmental Center ("GVDC") and the Harold Jordan Center ("HJC") in order to monitor the implementation of any provision of the Agreement other than Sections VI and VII. The United States and Parent Guardian Associations ("PGA") filed memoranda in support of the Motion (Docket Nos. 1051 and 1054), and State Defendants filed a response in opposition to the Motion (Docket No. 1055). Further, on July 19, 2011, Plaintiffs were granted leave to submit a supplementary memorandum in support of their motion and did so on August 1, 2011 (Docket No. 1061), to which State Defendants filed a supplemental response (Docket No. 1064) and Plaintiffs filed a reply (Docket No. 1065).

1

# I. PROCEDURAL HISTORY

In 1995, the United States Department of Justice ("DOJ") found that State Defendants had violated the civil rights of residents at three of State Defendants' developmental centers. Based on the DOJ's findings, People First of Tennessee and persons with disabilities who were institutionalized at the Clover Bottom Developmental Center filed a class action on December 22, 1995, against State Defendants (Docket No. 1). Shortly after the case was filed and by agreement of the parties, the Magistrate Judge arranged a series of settlement conferences which addressed not only the Clover Bottom Developmental Center but three other Tennessee state developmental centers including GVDC, HJC, and the Nat. T. Winston Developmental Center.[1] The PGA of these centers and the DOJ were invited and agreed to participate in the discussions. The negotiations resulted in the Agreement, which addresses conditions at the four developmental centers and placement in the community and the creation for community services for former residents of the developmental centers.

After the Agreement was negotiated, People First of Tennessee filed an Amended Complaint, adding residents of the other three developmental centers as plaintiffs and adding the developmental centers as defendants. The United States filed a parallel lawsuit of its own, and the two cases were consolidated by this Court. After conducting a fairness hearing, the Court conditionally approved the Agreement and once certain amendments were made to the Agreement, the Court the granted final approval on November 23, 1999. (Docket No. 327).

The Agreement provides for the creation of the QRP, comprised of a panel of experts, to "assist in the implementation of this Agreement." (Id. at 58.). The two primary functions of the QRP are "i) to review placement decisions and planning; and ii) to assist in monitoring the

---

[1] As a result its closure in 1998, Nat. T. Winston Developmental Center is no longer a party to the litigation.

implementation of this Agreement." (Id.). The QRP is responsible for developing its own policies and procedures and for modifying its procedures and review methodologies as needed in order to meet the requirements of different stages of implementation of the Agreement. (Id.). The Agreement provides that, in conjunction with the parties and subject to their agreement, the QRP has the authority to develop an "evaluation methodology to be used for their annual system reviews" upon the condition that such methodology be reduced to writing and include certain components enumerated in Section X.A.3.d. (Id. at 62.). Furthermore, Section X.A.2. states that, "[a]ll modifications of these policies and procedures must be made in writing and are subject to the parties' agreement." (Docket No. 327 at 58-59).

Pursuant to Section X.B.12. of the Agreement, both GVDC and HJC individually filed motions for partial termination of the Agreement, which were granted by the Court on March 16, 2006, and September 30, 2008, respectively (Docket Nos. 770 and 871).

## II. ANALYSIS

### A. Partial Termination of the Agreement with Respect to GVDC and HJC

The Agreement provides in Section X.B.12., for partial termination of the Agreement upon a showing by State Defendants of partial compliance.

> After this Agreement has been in effect for at least two years, the State Defendants may petition for termination of this Agreement in part. Such petition for partial termination shall be available only for demonstrating the achievement and maintenance of compliance with all of the provisions of Sections VI . . . and VII.

(Docket No. 327 at 68). The partial termination orders for GVDC and HJC were entered upon conditions agreed to by the parties. For GVDC, those terms and conditions include an agreed order stating that:

> 1. All current Greene Valley Developmental Center residents shall remain Class Members and shall retain all their rights as Class Members pursuant to Section I, II, III, IV, V, VIII, IX, X of the Settlement Agreement;

3

> 2. The State will maintain services to Greene Valley Developmental Center residents at a constitutional level as required by law. In an effort to maximize the number of Class Members who choose to live in the community, the State will make Class Members, their families and/or Conservators and the public aware of good community residential (both Waiver and ICF/MR) and day programs and offer education to Class Members, their families and/or Conservators about real, meaningful choices concerning all the available existing options for services in the community as well as community services that can be developed. . . .
>
> 3. Starting in fiscal year 2007-2008, the State will develop sixteen four person ICF/MR homes in the geographic area served by Greene Valley Developmental Center.

(Docket No. 770 at 2-3). The terms and conditions included in the order granting partial termination of the Agreement with respect to HJC were similar. (Docket No. 871 at 2-3).

As a result of complying with Sections VI and VII of the Agreement, the Court granted GVDC's and HJC's motions for partial termination of the Agreement (Docket Nos. 770 and 871). Consequently, GVDC and HJC were relieved of the obligation to comply with Sections VI and VII of the Agreement, but all other provisions of the Agreement remain intact. The Agreement does not indicate that a partial termination of the Agreement exempts the party from undergoing the QRP's annual review. The Agreement requires State Defendants to remedy their violations of class members' civil rights by making improvements in six broad areas, only two of which no longer apply to GVDC and HJC. Thus, contrary to State Defendants' contentions, GVDC and HJC remain parties to this litigation and are obligated to comply with the remaining provisions of the Agreement as previously ordered.

**B. QRP's Authority to Conduct On-Site Reviews at GVDC and HJC**

In Section X.A.3.d., the Agreement provides that "the Panel shall develop, in conjunction with the Parties and subject to their agreement, a written, professionally-based, evaluation methodology to be used for their annual system reviews of the quality of all services and supports provided to citizens in the developmental centers and in the community." (Docket No.

4

327 at 62). The Agreement continues by stating that the methodology must, at least, include six certain components, including an "approach and procedure for site visits, site visit preparation, and on-site data collection" as well as "the anticipated number of days and types of activities conducted on-site to evaluate compliance." (Id.). There is no doubt that the Agreement contemplates and provides for on-site visits.

The remaining issue in dispute is the appropriate methodology to be used by the QRP for conducting on-site visits, including the method for providing the QRP with copies of the Individual Support Plans ("ISPs") for class members living in Intermediate Care Facilities for persons with Intellectual Disabilities ("ICFs-ID"). In this case, the parties dispute the appropriate methodology to be used by the QRP for their annual review at the developmental centers. Over the past few years, the parties have addressed the issue of the QRP's methodology in numerous mediation sessions, but have been relatively unsuccessful in proposing a methodology upon which the parties can agree long term. On December 23, 2010, Plaintiffs, with the knowledge and consent of State Defendants, filed a Notice of Filing of Quality Review Panel Community Review Methodology (Docket No. 1049), which contained an agreed upon Annual System Review Methodology and its associated component Individual Assessment Rating Tool to be used by the QRP in future annual community reviews. The Annual System Review Methodology expressly provides for the QRP to conduct on-site reviews. "The annual review is intended to be comprehensive and accurate. During the time leading up to the onsite review, the Quality Review Panel will be accumulating information that will be utilized as part of the annual review process." (Docket No. 1049-1 at 1). In their response, State Defendants aver the proposed methodology Plaintiffs attached to its Motion was subsequently replaced with a different version.

5

It is apparent to the Court based upon the parties' December 23, 2010 notice to the Court, that the parties were able to reach an agreement regarding the proper methodology to be used by the QRP to review the services and supports provided to class members in the community. (Docket No. 1049). However, it does not appear that the parties, as of yet, have come to an agreed upon methodology to be used by the QRP at the developmental centers or a method for providing the QRP with copies of the ISPs for class members living in ICFs-ID.

### C. Legal Standard for Declaratory Judgment

District courts "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act." *Pakideh v. Ahadi*, 99 F.Supp.2d 805 (E.D. Mich. 2000) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995)). In deciding whether to proceed with a declaratory judgment action, courts consider the following factors: (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or to provide an arena for a race for res judicata; (4) whether the use of the declaratory action would increase friction between federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternate remedy which is better or more effective. *Albie's Foods, Inc. v. Menusaver, Inc.*, 170 F.Supp.2d 736, 739 (E.D. Mich. 2001). In this case, the first factor weighs in favor of a declaratory judgment, as a declaration by the Court regarding whether the QRP's methodology permits on-site visits would settle the controversy. Further, because of the impasse between the parties, a declaratory order would provide an answer to this disputed issue and in turn, clarify the legal relations between the parties. Moreover, in their response, State Defendants "agree that a declaratory order is needed to resolve a dispute among the parties

6

regarding the proper construction of the Settlement Agreement." (Docket No. 1055 at 2). Regarding the third factor, there is no indication that this remedy is being used as a "procedural fencing" mechanism or as a means of providing an arena for a race for res judicata. Similarly, since there are no issues of state law or proceedings in a state forum implicated in the Motion, the fourth factor weighs in favor of granting Plaintiffs' Motion. Finally, the fifth factor also weighs in favor of granting Plaintiffs' Motion, as a declaratory order appears to be the least intrusive remedy to resolve the present dispute between the parties. In sum, the factors to be considered by the Court lean in favor of the Court proceeding with this declaratory judgment action.

Although Plaintiffs' motion will be granted, in part, the Court will decide the remaining matters in dispute, namely (1) the methodology for the QRP's on-site visits and (2) the method of providing the QRP with copies of the ISPs for class members living in ICFs-ID, at a February 15, 2012 hearing should the parties fail to reach an agreement regarding these lingering issues before that date.

### III. CONCLUSION

Based upon the foregoing, Plaintiffs' Motion for Declaratory Relief (Docket No. 1046) will be granted to the extent that, pursuant to the Agreement, the QRP has authority to conduct on-site visits at GVDC and HJC. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE