# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| PEOPLE FIRST OF TENNESSEE, *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:95-cv-1227 ) |
| CLOVER BOTTOM DEVELOPMENTAL CENTER, *et al.* | ) ) ) Judge Sharp |
| Defendants. | ) ) |

## MEMORANDUM

Before the Court is an unopposed joint motion seeking approval of an Exit Plan (Docket No. 1118-1) and entry of a proposed Agreed Order (Docket No. 1118-2), which were presented at a fairness hearing held January 21, 2015. This motion is the culmination of intense negotiations between the Parties, Plaintiffs United States of America (the "United States"), People First of Tennessee, Inc. ("People First"), and Intervenors Parent Guardian Association of Clover Bottom Developmental Center ("PGACB") and Parent Guardian Association of Green Valley Developmental Center ("PGAGV"), and Defendants, the State of Tennessee, et al.

Also pending is a Motion to Intervene filed by a group of conservators for family members residing at the State's last remaining institution, Green Valley Developmental Center ("GVDC") (Brian Bragdon, Lisa Hill, Gail King, Ricky Lingerfelt, Gena Wexler, Russell Wexler, Leonard Wyrick Jr.) and a nonprofit organization Citizens for a Better Tennessee (collectively "Movants") (Docket No. 1121). For the following reasons, the Court will approve the Exit Plan and enter the Agreed Order. The Motion to Intervene will be denied.

## I. Facts

On May 7, 2014, the Court ordered the Parties to participate in a settlement conference in order to reach resolution in this litigation, which has spanned twenty years (Docket No. 1101). Over the course of many conferences with Magistrate Judge Griffin, the Parties drafted an Exit Plan, which "sets forth objective and measurable exit criteria that, together with the proposed Agreed Order, provide for the dismissal of this action with prejudice upon the State's satisfaction of those criteria." (Docket No. 1118 at 2).

The terms of the Exit Plan, to be completed in two phases concluding June 30, 2016,[1] are set forth in detail in the proposed Agreed Order (Docket No. 1118-2). They include, *inter alia*, implementation of revised Individual Support Plans and Quality Assurance tools, and further training for staff of Independent Support Coordination Agencies, case managers, residential and day services providers, and law enforcement.[2] The Exit Plan further provides for refinements to the use of psychotropic medications for individuals with intellectual or developmental disabilities, including Family Training, examination of authorization criteria for reimbursement of psychotropic medications by the TennCare Pharmacy Advisory Committee, and standardization of the referral process to regional Psychopharmacology Review teams.[3] It provides for the establishment of behavior respite services and behavioral crisis prevention,[4] and education and enrollment of class members in SelectCommunity.[5] Finally, the Exit Plan notes

---

[1] The Exit Plan provides that "any failure to complete an obligation required to be completed by a date prior to June 30, 2016 shall not be deemed to constitute a failure to satisfy a material provision of this Exit Plan so long as the obligation is satisfied on or before June 30, 2017." (Docket No. 1118-1 at 2-3).

[2] Id. at §§ III, VI.

[3] Id. at § IV.

[4] Id. at § V.

[5] Id. at § VII.

2

the State's revision of the Freedom of Choice Form setting forth the rights of persons choosing to receive care at an Intermediate Care Facility for Individuals with Intellectual Disabilities.[6]

After entry of the proposed Agreed Order, the State will announce the closure of GVDC and prepare Individual Support Transition Plans for all class members residing there.[7] This final section prompted the Motion to Intervene from Movants, who strongly contest the cessation of services at the institution (Docket No. 1121). Though all residents of GVDC are class members represented by Plaintiff People First of Tennessee, Movants seek to carve out a second class comprised of "all profoundly disabled persons receiving care or programs from the defendants" or, alternatively, "all profoundly disabled persons residing now or in the past five years at GVDC and their conservators." (Id. at 17). They request the Court "[i]ssue a preliminary and permanent injunction order under Rule 65, F. R. CIV. P. to enjoin the closing of GVDC and to require adequate resources, staffing and care for profoundly disabled persons" and "declaratory judgment that the present level of resources, staffing and care for profoundly disabled persons in Tennessee violates their constitutional rights under the 5th and 14th Amendments, federal and state laws." (Docket No. 1121-2 at 20). This motion will be treated further in the analysis below.

## II. <u>Analysis</u>

### A. The Proposed Exit Plan and Agreed Order

Prior to approving a proposed settlement in a class action, the district court must find a settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). It must also conduct a fairness hearing, which acts as an additional "procedural safeguard" for the parties to "proffer

---

[6] Id. at § VIII.

[7] Id. at § X.

sufficient evidence to allow the district court to review the terms and legitimacy of the settlement." Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 635 (6th Cir. 2007) (hereinafter "UAW"). Throughout this inquiry, the district court retains "wide latitude" to limit the information presented by the parties "to whatever is necessary to aid it in reaching an informed, just and reasoned decision." Id. (quoting Tenn. Ass'n. of Health Maint. Orgs. v. Grier, 262 F.3d 559, 567 (6th Cir. 2001)).

Courts in the Sixth Circuit look to several factors to determine whether a proposed settlement agreement meets the requirements of Rule 23(e)(2): "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." UAW, 497 F.3d at 631. District courts engaging in this assessment "enjoy[] wide discretion in assessing the weight and applicability of these factors. Todd v. Retail Concepts, Inc., 2008 WL 3981593, at *4 (M.D. Tenn. Aug. 22, 2008) (citing Granada Invs., Inc. v. DWG Corp., 962 F.2d 1203, 1205-06 (6th Cir. 1992)).

"The fairness of each settlement turns in large part on the bona fides of the parties' legal dispute." UAW, 497 F.3d at 631. The Court's task is not to decide which Party's argument is stronger, as this would "defeat the purpose of a settlement in order to approve a settlement." Id. at 632. "The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." Id. A review of the procedural history of this long-running dispute, and of the Exit Plan and Agreed Order, leads the Court to conclude the Parties' proposed settlement is fair and appropriate. The factors below are particularly instructive.

First, no evidence of fraud or collusion has been presented, nor is any suggested. See Se. Milk Antitrust Litig., 2013 WL 2155379, at *4 (E.D. Tenn. May 17, 2013) ("Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered.") (quoting In re Packaged Ice Antitrust Litig., 2011 WL 6209188, at *14 (E.D. Mich. July 13, 2006) (internal citations omitted)). Both Parties are represented by experienced counsel and settlement negotiations have been overseen by Magistrate Judge Griffin. Furthermore, experienced class members have also played an active role in drafting the Exit Plan and Agreed Order.

Second, the Court is mindful that "'[m]ost class actions are inherently complex and settlement avoids the costs, delays, and a multitude of other problems associated with them.'" Se. Milk Antitrust Litig., 2013 WL 2155379, at *4 (quoting In re Telectronics Pacing Sys. Inc., 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001)). In the event the Exit Plan is not approved, the specter of further litigation looms large. Defendants have reserved the right to abandon the settlement plan if the Court does not enter the Agreed Order by January 31, 2015 (Docket No. 1118-1 at 2). Thus, if this step forward is unsuccessful, the Parties will very likely be launched many steps back.

As for the likelihood of success on the merits, at the fairness hearing, counsel for Plaintiff People First of Tennessee highlighted aspects of the settlement that would have been unattainable through litigation, specifically establishment of a Quality Review Panel to oversee closure of GVDC, a detailed framework for training of Independent Support Coordinators, and the strengthening of mental health intervention services to avert behavioral crises. Thus, it appears collaboration has fostered what may be a more positive result for Plaintiffs than would be achievable even through successful litigation (Transcript of Record, Jan. 21, 2015 at 13:52).

As noted by counsel for Plaintiff United States, the Exit Plan brings to fruition the promise of the settlement agreement and goes farther than the Court could require.

This also makes clear that the Exit Plan has the support of class counsel and class representatives. "The judgment of experienced counsel and class representatives regarding the settlement should be given significant weight." Se. Milk Antitrust Litig., 2013 WL 2155379, at *5. "Their collective judgment that the settlement is in the best interest of class members weighs heavily in favor of the Court's final approval of the Agreement." Id. While Movants have voiced strong dissent to one section, the Exit Plan is largely supported and the product of long, hard collaboration between the Parties. See Todd, 2008 WL 3981593, at * 5 (approving settlement where "[b]oth sides are represented by able and experienced class counsel who hold the opinion that the Settlement Agreement should receive final approval.")

Finally, the proposed settlement benefits the public interest. See UAW, 497 F.3d at 632 (noting the "federal policy favoring settlement in class actions" when approving the proposed settlement between a labor union and auto manufacturer); Se. Milk Antitrust Litig., 2013 WL 2155379, at *7 ("[T]here is a public interest in settlement of disputed cases that require substantial federal judicial resources to supervise and resolve."). The terms of the Exit Plan are a roadmap for the most recent reforms in a deinstitutionalization effort that began decades ago. The Supreme Court of the United States played a hand in this movement when, in Olmstead v. L.C. ex rel. Zimring, it recognized "unjustified institutional isolation of persons with disabilities is a form of discrimination" that "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals." 527 U.S. 581, 600-05 (1999) (balancing this concern with the State's role as administrator of services for people with mental disabilities, the Court

also noted that States must have "leeway" to "maintain a range of facilities and to administer services.").

For these reasons, the Court concludes the settlement agreement meets the requirements of Rule 23(e)(2) of the Federal Rules of Civil Procedure. The Exit Plan will be approved and the proposed Agreed Order entered.

B.  **The Motion to Intervene**

Mindful of these public interest benefits, the Court turns to the Motion to Intervene. Movants seek to intervene as of right under Federal Rule of Civil Procedure 24(a)(2) and for permissive intervention under Rule 24(b). They request the Court enjoin closure of GVDC and provide for sufficient resources to care for profoundly disabled residents. While deeply empathetic to Movants' concerns, the Court concludes this motion must be denied, as it fails to satisfy the elements for intervention and would require the Court act in a matter reserved to the discretion of the State.

Each of the conservators is the family member of a profoundly disabled person who has resided at CVDG for over thirty years. Through many affidavits, Movants shared personal stories of the exceptional care their family members received at GVDC and fears for the physical health and emotional wellbeing of residents who would be moved from the place they considered home.

In response to these concerns, counsel for the Parties explained the detailed transfer plan created to ensure residents' smooth transition, the wide array of alternative equivalent care options available, and the motivation for reform of the prior institutionalization framework with closure of the last remaining State institution.

### i. Intervention by Right

In the Sixth Circuit, "proposed intervenors must meet four criteria before intervention by right is permitted: (1) the application for intervention must be timely; (2) the applicant must have a substantial, legal interest in the subject matter of the pending litigation; (3) the applicant's ability to protect that interest must be impaired; and (4) the present parties do not adequately represent the applicant's interest. The proposed intervenor must prove each of the four factors; failure to meet one of the criteria will require that the motion to intervene be denied." Grubbs v. Norris, 870 F.2d 343, 345 (6th Cir. 1989) (citing Triax Co. v. TRW Inc., 724 F.2d 1224, 1227 (6th Cir. 1984)). Here, Movants fail to meet the first element.

When considering whether an application for intervention is timely, courts consider five factors in the context of all relevant circumstances: "(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his or her interest in the case, to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention." Id. at 345-46.

Movants' motion was filed on January 17, 2015, four days before the scheduled fairness hearing. Movants argue the "first and only notice that the closing of GVDC was an issue" was January 6, 2015, when the Parties filed the joint motion seeking approval of the Exit Plan and entry of the proposed Agreed Order (Docket No. 1121-1 at 3). However, as early as 1996, Plaintiff People First of Tennessee, on behalf of its class members (including all residents of GVDC), sought development of "community living arrangements for all members of the plaintiff

class for whom such living arrangements are called for" as well as "community services necessary to provide class members with minimally adequate habilitation." (Docket No. 48 at 80). The Settlement Agreement reached in 1999 also sought to provide class members the "least separate, most integrated setting appropriate to meet his or her individual needs." (Docket No. 327 at 3). Since the commencement of this litigation and related disputes, the three other State-run institutions have closed.

In light of this background and procedural history, the Court agrees with Defendants that a consistent goal of this action has been "to move class members into community based homes and out of the congregate institutional environment." (Docket No. 1123 at 6). Thus, Movants should have reasonably known closure of GVDC might be a concern from very early in the course of this litigation and could not have learned of it first when the Parties filed the joint motion to approve the Exit Plan and enter the Agreed Order.

Furthermore, the Parties – including class members who have already moved out of GVDC and the other now-closed institutions – would be significantly prejudiced should Movants' request be granted and litigation continue, as they stand to benefit from the increased training for care providers and other institutional reforms provided for in the Exit Plan. Those class members, it should be noted, have largely successfully transitioned to alternative programs.

Because Movants fail the first element required to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), the motion must be denied.

The Court adds that even if the Motion to Intervene were timely, Movants still cannot satisfy the remaining elements for intervention by right. Movants have not shown a legally protectable interest in the provision of the Exit Plan that concerns closure of CVDG. The Parties, the Tennessee Department of Health and Human Services, Center for Medicare and

Medicaid Services (CMS),[8] and case law within the Sixth Circuit and other jurisdictions[9] uniformly support the assertion that the power to close GVDC rests with the State. Nor have Movants shown their interests are unrepresented. As noted by Plaintiffs, "[t]he fact that the PGAs agreed to compromise does not mean that they did not share and vigorously advocate the movants' interests." (Document No. 1133 at 3).

   ii.  *Permissive Intervention*

 "To intervene permissively, a proposed intervenor must establish that the motion for intervention is timely and alleges at least one common question of law or fact." United States v. Michigan, 424 F.3d 438, 445 (6th Cir. 2005) (citing Michigan State AFL–CIO v. Miller, 103 F.3d 1240, 1248 (6th Cir. 1997)). "Once these two requirements are established, the district court must then balance undue delay and prejudice to the original parties, if any, and any other relevant factors to determine whether, in the court's discretion, intervention should be allowed." Id.

---

[8] As noted in Plaintiffs' "Response in Opposition to Brian Bragdon *et al.*'s Supplemental Memorandum of Law on Timeliness, Class Action, and Lack of Fairness in Proposed Final Order" (Docket No. 1133 at 4), "the PGAs have advocated since the earliest days of this litigation that parents and guardians should be allowed to choose a continued stay at the institutions" which led the State of Tennessee to submit an inquiry to CMS regarding whether the Social Security Act required Tennessee to allow a Medicaid beneficiary "to remain in a state institution even though the state had decided that the person should be served elsewhere." (Id.). The CMS confirmed "the Social Security Act did not require an unwilling provider … to continue to provide services that it had determined were inappropriate." (Id., see Docket No. 749, Exh. B).

[9] See e.g., United States v. Tenn., 2005 WL 1506480, at *5 n.3 (6th Cir. June 23, 2005), People First of Tenn. v. Clover Bottom Dev. Ctr., (M.D. Tenn. May 28, 2010) (while "under the Medicaid Act, [Clover Bottom Developmental Center] residents who are eligible for and receive Medicaid assistance from the State have freedom of choice to choose among a range of qualified providers" these providers "must be willing to furnish services to the recipient"); see also Rovner v. Keystone Human Servs., 2013 WL 4016490, at *6-7 (M.D. Pa. Aug. 6, 2013) ("[P]laintiffs' suggest that [defendant Medicaid service provider] was obligated to continue rendering waiver services, indefinitely, because [defendant] was, at one time, a willing provider of [plaintiffs'] waiver services. The plaintiffs have no legal citation to support this conclusion, which would effectively force providers to remain 'willing' to offer services even if they became, in fact, unwilling to do so. Nothing in the applicable statute, regulations, or case law that we have identified supports this assertion."); Pfaff v. Washington, 2008 WL 2242461, at *11 (W.D. Wash. May 29, 2008) ("if a particular provider decides to stop serving a Medicaid recipient, he or she is no longer "qualified" or "willing" to "undertake" those services").

10

For the same reasons that intervention by right must be denied, so too must Movants' request for permissive intervention, as it is untimely and poses significant risk of undue delay and prejudice to the Parties.

### iii. The State's Capacity to Close GVDC

Aside from Movants' inability to meet the requirements to intervene under the Federal Rules, the result they seek – an injunction to enjoin the closing of GVDC – cannot be granted. Primarily, the Parties, this Court, and the Sixth Circuit understand the closure of this State-run institution to be within the State's capacity and an inappropriate question for federal court review. See United States v. Tenn., 2005 WL 1506480, at *5 n.3 ("We note only in passing that the major objections to the settlement agreement by the Parent-Guardian Association and the district court appear to be over the closing of Arlington Developmental Center. While we express no opinion about the wisdom or lack thereof of closing Arlington, it is our understanding that the State of Tennessee has the power to close Arlington regardless of a provision to that effect in the settlement agreement.").

Evidence of the State's motivation to pursue reforms in this area was presented to the Court at the fairness hearing. While consistent with a national movement towards deinstitutionalization, the plan also allows the State to provide commensurate care at a much lower cost. As counsel for Plaintiff United States explained, the 96 current residents at GVDC receive care at approximately $1,361 per day per person. This cost can be decreased significantly, allowing the State to offer services to a greater portion of the 7,000 families on the wait list to receive care (Transcript of Record, Jan. 21, 2015, at 13:58).

The Exit Plan allows residents the choice to continue receiving care at an Intermediate Care Facility for Individuals with Intellectual Disabilities or to receive waiver services. While

specific transition plans for all residents have not yet been developed, counsel for Defendants reiterated in the fairness hearing that the transition process would not begin until it could be done in compliance with the safeguards memorialized in the Exit Plan. Defendants emphasized that "the State has a track record of being able to close institutions and close them safely, including people with severe medical conditions." (Transcript of Record, Jan. 21, 2015, at 13:38). Furthermore, as offered by counsel for Intervenor PGACB and PGAGV, closure of GVDC through the Exit Plan, rather than undertaken unilaterally by the State, allows class members to have input in the process and monitor the State's compliance (Transcript of Record, Jan. 21, 2015, at 14:09).

The Court understands Movants' concerns that "profoundly disabled" residents "face greater challenges and impediments to their health and quality of life than other disabled persons." (Docket No. 1121 at 2). However, residents of the other institutions with similar medical needs have been transitioned to alternative care facilities with largely positive results. As noted by counsel for Defendants, GVDC houses 81 individuals diagnosed with profound intellectual disabilities. When Arlington Developmental Center closed, there were 121 individuals with this diagnosis. Forty-four residents of GVDC require enteral tube feeding, compared to 35 who transitioned from Arlington Developmental Center and 50 who transitioned from Clover Bottom Developmental Center. Additionally, Plaintiffs point to a lower mortality rate among residents in community services than at GVDC between 2008 and 2014. (Docket No. 1133 at 10).

## III. Conclusion

To effectively facilitate reform in mental health services, the Court cannot allow "perfect to become the enemy of good" nor allow the concepts of federalism and separation of powers to be ignored. The Court concludes that the Exit Plan presented by the Parties is "fair, reasonable, and adequate" and provides the next iteration of improvement to the lives of those with disabilities in Tennessee. It will test political will and legislative leadership to continue that progress and to determine how best to care for those often left in the shadows.

For the reasons detailed above, the Court will grant the unopposed joint motion seeking approval of an Exit Plan (Docket No. 1118-1) and entry of a proposed Agreed Order (Docket No. 1118-2). The Motion to Intervene brought by conservators of GVDC residents and Citizens for a Better Tennessee (Docket No. 1121) will be denied. An appropriate Order will enter.

_____
KEVIN H. SHARP
CHIEF UNITED STATES DISTRICT JUDGE